# In the United States District Court
## for the Southern District of Georgia
## Waycross Division

JOHN TRUSCHKE,

    Plaintiff,

    v.

PHYLLIS CHANEY, LPN; KIMBERLY
BELL, LPN; and GUY AUGUSTIN,
M.D.,

    Defendants.

NO. 5:17-CV-93

## ORDER

Plaintiff filed this action seeking damages pursuant to 42 U.S.C. § 1983. Dkt. No. 1. Before the Court is Defendants Nurse Chaney, Nurse Bell, and Dr. Augustin's Motion for Summary Judgment. Dkt. No. 34. This Motion has been fully briefed and is ripe for review. For the reasons stated below, Defendants' Motion is **GRANTED**.

## BACKGROUND

On February 6, 2017, Plaintiff was an inmate at Coffee Correctional Facility in Coffee County, Georgia, when he collided with another inmate while playing softball. Dkt. No. 39-1 ¶¶ 1, 2. Defendant Phyllis Chaney, LPN, responded to the softball field. Dkt. No. 34-2 ¶ 4. Plaintiff was transported by wheelchair by Nurse Chaney from the softball field to the correctional facility's

medical unit for evaluation. Dkt. No. 39-1 ¶¶ 4, 5; Dkt. No. 34-2 ¶ 4. From there, Nurse Chaney and Dr. Augustin determined that Plaintiff needed emergency medical treatment and ordered that Plaintiff be sent to an emergency room ("ER") for independent evaluation and treatment. Dkt. No. 34-2 at 79, 242; Dkt. No. 34-3 ¶ 4; Dkt. No. 34-4 ¶ 4.

At the ER, x-rays were taken of Plaintiff's right knee and clavicle, and Plaintiff's right knee was placed in a knee immobilizer. Dkt. No. 34-2 at 381-82. Medical Records from the ER show that the x-rays were given the priority of "STAT." Id. at 381. The Doctor reviewing the knee x-ray diagnosed Plaintiff with a "[n]on-displaced fracture at the base of the tibial spine." Id. at 392, 394-95. While these x-rays were ordered, performed, and documented in Plaintiff's February 6, 2017 ER medical records, id. at 381, 384, an MRI was never ordered, recommended, or mentioned in Plaintiff's February 6, 2017 ER medical records. Further, the discharge instructions state that Plaintiff was referred to a surgeon "for an appointment as soon as possible" and instructed Plaintiff to "[b]ring these instructions with you for your appointment," but, again, the instructions do not mention an MRI. Id. at 406.

While a knee immobilizer was ordered, id. at 382, a wheelchair was never ordered. In fact, the lone mention a wheelchair was a notation in the records that Plaintiff was discharged "via

2

wheelchair." Id. at 409. Notably, an orthopedist at the ER, Dr. Depersio, recommended a knee immobilizer and a follow-up appointment, but not a wheelchair. Id. at 398. The discharge instructions provided by the ER for the fractured knee further evidence that a wheelchair was never recommended. The instructions state under the heading "HOME CARE" that the patient "will be given a splint, cast or knee brace" and to "use crutches or a walker." Id. at 404. Again, the discharge instructions did not mention a wheelchair. Finally, all three Defendants swear that they do not recall Plaintiff ever requesting a wheelchair, dkt. no. 34-3 ¶ 7; dkt. no. 34-4 ¶ 7; dkt. no. 34-5 ¶ 8, and Dr. Augustin swears that a wheelchair was neither recommended nor ordered by the ER medical providers, dkt. no. 34-4 ¶ 7.

On February 17, 2017, Plaintiff went to Southeastern Orthopaedics and saw Joel Hernandez, PA-C. Dkt. No. 34-2 at 490; Dkt. No. 34-6 ¶ 4; Dkt. No. 39-1 ¶ 16. PA Hernandez recommended an MRI of Plaintiff's right knee. Dkt. No. 34-2 at 490; Dkt. No. 34-6 ¶ 5. The recommendation did not mention the need for a wheelchair. Id. The recommendation also noted that Plaintiff was given some range of motion exercises to do. Id. Dr. Barber, an orthopedist also of Southeastern Orthopaedics, reviewed PA Hernandez's impressions, opinions, and plans and agreed with them. Dkt. No. 34-6 ¶ 5. Dr. Barber swears that "relative to [Plaintiff's] February 17, 2017, visit" that "[t]here was nothing

AO 72A
(Rev. 8/82)

about [Plaintiff's] diagnosis and condition between the date of injury and February 17, 2017, that necessitated use of a wheelchair. A knee immobilizer and crutches were appropriate," id. ¶ 6, that "PA Hernandez did not order a STAT (urgent) MRI," id., that "[t]here was nothing about [Plaintiff's] condition on February 17, 2017, that indicated he required surgery at that time," id., and that "[t]here was nothing about [Plaintiff's] condition on February 17, 2017, that indicated he required follow-up prior to the completion of a routine MRI," id.

Plaintiff, however, has a different recollection of the February 17, 2017 appointment. Plaintiff declares that at the February 17, 2017 appointment Dr. Barber, not PA Hernandez, saw Plaintiff and that Dr. Barber "reiterated to [him] that [Plaintiff] needed to have an MRI performed as soon as possible." Dkt. No. 39-1 ¶¶ 16, 17, 19. Dr. Barber swears, however, that only PA Hernandez saw Plaintiff on February 17, 2017, and that he, Dr. Barber, "did not personally see or speak to [Plaintiff] on February 17, 2017." Dkt. No. 35-6 ¶ 4. Notably, the documentation recapping the visit bears the signature of PA Hernandez. Dkt. No. 34-2. That document was "e-signed" by Dr. Barber ten days after the visit, on February 27, 2017. Id.

On February 20, 2017, Defendant Dr. Augustin filled out an "Outpatient Referral Request" form requesting an MRI of Plaintiff's right knee. Dkt. No. 34-2 at 418. The form states

that the "Ortho. request[ed] MRI." Id. Dr. Augustin swears that
an MRI was not recommended or ordered by the ER medical providers
and that he "was not aware of any fact which caused [him] to
believe that a MRI was indicated or should be ordered by [him] at
any time prior to PA Hernandez's February 17, 2017 order for MRI."
Dkt. No. 34-4 ¶ 8. On March 6, 2017, an MRI was performed on
Plaintiff's right knee. Dkt. No. 34-2 at 301, 420.

On March 7, 2017, Plaintiff was transferred to a correctional
facility in Tennessee. Dkt. No. 39-2 ¶ 28. On April 10, 2017,
Plaintiff returned to Coffee Correctional Facility, and Nurse Bell
performed his intake screening, noting that he was alert and had
a brace on his knee. Id. ¶ 29.

On April 17, 2017, Plaintiff returned to Southeastern
Orthopedics; all parties agree that this time he was seen by Dr.
Barber. Dkt. No. 34-2 at 491; Dkt. No. 39-2 ¶ 30. Dr. Barber's
impressions were that Plaintiff had a "[m]edial tibial plateau
fracture with lateral compartment impaction factures," meniscus
tears, a torn ACL, and a possible torn PCL. Dkt. No. 34-2 at 491.
Regarding the plan for Plaintiff, Dr. Barber noted that he "talked
extensively" with Plaintiff "about the options for surgery." Id.
Dr. Barber did "not have a specific answer for [Plaintiff that
day] about whether he must or must not have surgery because
obviously this is an elective decision that he must make." Id.
Dr. Barber noted that he could not perform Plaintiff's surgery

AO 72A
(Rev. 8/82)

while Plaintiff was incarcerated, and Dr. Barber discouraged surgery at that time because Plaintiff's incarceration made rehab and recovery difficult. Id. Dr. Barber also noted that "for the time being he is going to work on quad strengthening, wean to weightbearing at 12 weeks post fracture, utilize crutches for the transition period and go to a knee sleeve with an ACE bandage." Id. Finally, Dr. Barber "e-signed" the document detailing Plaintiff's appointment on April 18, 2017, the day after the appointment. Id.

Dr. Barber swears that at the April 17, 2017 appointment Dr. Barber "spoke to the patient at length regarding his ligament injuries and surgical options" and "advised him that surgery would be elective." Dkt. No. 34-6 ¶ 7. Dr. Barber also swears that he advised Plaintiff that Dr. Barber could not perform any surgery while Plaintiff was incarcerated and that there were many factors that weighed against electing to have surgery while Plaintiff was incarcerated. Id. Along this line, Dr. Barber informed Plaintiff that any surgery while Plaintiff was incarcerated would have to be done at an incarceration medical facility. Id. Dr. Barber also swears that he "instructed [Plaintiff] to work on quad-strengthening, wean to weightbearing at 12 weeks, use crutches during transition, and wear a knee sleeve with an ACE bandage." Id. Dr. Barber further swears that he did not tell Plaintiff that he required surgery within two weeks, that he did not tell

AO 72A
(Rev. 8/82)

Plaintiff that he needed re-break surgery, that he did not tell Plaintiff that his tibula fractures healed improperly, and that he did not refer Plaintiff to a specialist for "re-break" surgery. Id. ¶ 9. Finally, Dr. Barber swears that he holds the following opinions regarding Plaintiff's April 17, 2017 visit and thereafter: (1) Plaintiff's diagnosis and condition did not necessitate use of a wheelchair—a knee immobilizer and crutches were sufficient until 12 weeks after injury, when he could begin to bear weight on his knee, id. ¶ 8; (2) Plaintiff's condition on that day did not require ligament surgery, which would have been inappropriate because Plaintiff's fractures were healing, id.; (3) at that time Plaintiff's fractures were healing as expected and without complication, id.; and (4) "nothing about [Plaintiff's] condition . . . suggest[ed] that corrective surgery was required at that time or would be required in the future," id.

On April 18, 2017, Dr. Augustin completed another "Outpatient Referral Request" for Plaintiff to see an orthopedic doctor for "evaluation for ACL reconstruction." Dkt. No. 34-2 at 327. On April 26, 2017, Plaintiff was evaluated by another orthopedist, Dr. Gaines. Dkt. No. 34-2 at 497-98. Dr. Gaines evaluation states under the heading "PLAN" that he "would certainly recommend some physical therapy to help [Plaintiff] with motion of his knee." Id. at 498. He also noted that Plaintiff could "weightbear [sic] as tolerated," and that Dr. Gaines was fine with Plaintiff

AO 72A
(Rev. 8/82)

switching to canes and crutches (instead of bearing weight on his knee). Id. Regarding surgery, Dr. Gaines "discussed this honestly with [Plaintiff] and discussed his need to rehab his knee and if he is doing well at the end of this, we could consider a discussion again regarding intervention surgically, however if we were to intervene and reconstruct his ACL and fix his meniscal tears at this time, it would likely make him a lot worse due to his pain tolerance and his preoperative stiffness." Id. Plaintiff was given a physical therapy script by Dr. Gaines, which noted a diagnosis of knee pain and an ACL deficient knee. Id. at 325. The script set forth an exercise regimen with detailed instructions on nine exercises that Plaintiff was to perform and how often he was to perform them. Id. at 326. Dr. Gaines also filled out an "Order Form" noting that Plaintiff's only diagnosis was knee pain and that Dr. Gaines ordered a cane and knee brace. Id. at 499. Finally, Dr. Gaines signed a Coffee Correctional Facility "Consult Sheet" that set forth the "Consulting Physician's Report"; the report noted under the heading "Orders/Recommendations," that Plaintiff needed a "cane, knee brace, [and] PT." Id. at 323.

Plaintiff has a different recollection than what is contained in the medical records. Plaintiff declares that Dr. Gaines instructed Plaintiff that he needed physical therapy so that he could bend his right knee farther and that once he can bend his right knee sufficiently, Dr. Gaines could perform necessary re-

AO 72A
(Rev. 8/82)

break surgery. Id. ¶ 25. Plaintiff further declares that he was never provided physical therapy by Coffee Correctional, but instead, was merely provided e-stimulation by means of a TENS unit, which only occurred twice over the two months after his April 26 appointment. Id. ¶ 26.

Upon Plaintiff's return from Dr. Gaines office on April 26, Nurse Bell saw Plaintiff and notified Dr. Augustin. Dkt. No. 39-2 ¶ 47. Dr. Augustin and Nurse Bell evaluated Plaintiff. Dkt. No. 34-2 at 42. Nurse Bell filled out a chart report and noted that Plaintiff "return[ed] with orders to have cane, brace, and PT." Id. The chart further states that Nurse Bell "[n]otified Dr. Augustin of [Plaintiff's] new orders and gave orders to place [Plaintiff] on PT twice a week on Monday and Wednesday for 3 months." Id. Under the heading "Plan," the chart report states that Plaintiff was "to start PT on Monday and Wednesday for 3 months." Id. Both parties agree that "Dr. Augustin considered Dr. Gaines' recommendations and ordered PT, knee sleeve, cane and follow up." Dkt. No. 39-2 ¶ 48. Plaintiff's "Condensed Chart Report," states that Dr. Augustin ordered "Physical Therapy" on April 30, 2017. Dkt. No. 34-2 at 3. On June 1, 2017, Plaintiff was seen by Dr. Augustin, who noted Plaintiff's history of recommendations for conservative management of his knee and that Plaintiff was "currently on PT." Id. at 40. On August 9, 2017, in another follow up with Plaintiff, Dr. Augustin noted that

Plaintiff was "very angry" and "complaining about the PT he is receiving, calls it inadequate." Id. at 113. Another chart report from November 7, 2017, electronically signed by Dr. Augustin as its author, states that Plaintiff "has been on PT for several mos [sic]." Id. at 33.

On May 11, 2017, Plaintiff was released from segregation back to general population and issued a cane. Id. at 41. On May 24, 2017, Plaintiff began seeing Dr. Cronin, a physical therapist at the correctional facility, for physical therapy. Id. at 132. Dr. Cronin's notes, other than the notation for electronic stimulation, i.e., "ES," are illegible. Nevertheless, Plaintiff was seen by Dr. Cronin on the following dates: May 31, 2017, id. at 131; June 5, 2017, id. at 130; June 7, 2017, Plaintiff was marked as a no show, id. at 129; June 12, 2017, id. at 128; June 14, 2017, Plaintiff was marked as a no show, id. at 127; June 19, 2017, again, Plaintiff was marked as a no show, id. at 126; an undated entry, id. at 125; June 28, 2017, id. at 124; July 5, 2017, Plaintiff was marked as a no show, id. at 123; July 10, 2017, Plaintiff was marked as a no show, id. at 122; July 12, 2017, id. at 121; July 17, 2017, id. at 120; July 19, 2017, id. at 119; July 24, 2017, id. at 118; July 25, 2017, id. at 117; July 31, 2017, id. at 116; August 2, 2017, id. at 115; August 7, 2017, id. at 114; August 9, 2017, id. at 108; August 14, 2017, id. at 109; August 16, 2017, id. at 107; August 21, 2017, id. at 106; August

23, 2017, id. at 105; August 28, 2017, id. at 104; and August 30, 2017, id. at 103. Documentation of Plaintiff's sessions with Dr. Cronin continue at intervals of twice or once a week from September 2017 to late November 2017. Id. at 91-102, 178, 180, 182, 304-08, 321.

Defendants have provided an expert report from Dr. Michael T. Puerini, who is a correctional medicine expert and consultant. Dkt. No. 34-1 at 1. Dr. Puerini reviewed the Complaint, the Coffee Regional Medical Center medical records of Plaintiff, the Coffee Correctional Facility medical records of Plaintiff, the Southeastern Orthopaedics (where Dr. Barber practices) medical records of Plaintiff, and the Optim Orthopedics (where Dr. Gaines practices) medical records of Plaintiff. Id. at 2. After reviewing these records Dr. Puerini opined that "no outside provider recommended or ordered a wheelchair for Mr. Truschke and a wheelchair was not indicated." Id. at 6.

Similarly, Dr. Puerini opined:

> There is no evidence of any policy, procedure, rule, mandate or protocol which prohibited providers in the emergency room from performing a MRI of Mr. Truschke on 02/06/17. If the medical providers in the emergency room thought a MRI was indicated, the standard of care required them to perform one or order one to be done on an outpatient basis. There was no medical indication

11

noted in the CRMC emergency room for this procedure, so MRI procedure was neither done nor suggested.

Id. at 6-7.  Finally, Dr. Puerini concluded:

> The allegations set forth by Mr. Truschke in his Complaint are not supported by his medical records.  Mr. Truschke was timely referred for treatment following an injury sustained during an alleged recreational activity.  He was treated by an independent emergency room and two independent orthopedic surgeons.  "Re-break" surgery was never contemplated for Mr. Truschke as it was not indicated.  Mr. Truschke's fracture(s) healed as expected and without complications.  Mr. Truschke's orthopedic surgeons both discussed the possibility of MCL, ACL, and/or PCL repair surgery with Mr. Truschke, but neither recommended it.

Id. at 8.

Plaintiff filed this action to recover damages and other compensation, which he claims is owed to him under 42. U.S.C. § 1983.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of

AO 72A
(Rev. 8/82)

the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J.,

13

dissenting)).   Second,  the  nonmovant  "may  come  forward  with
additional  evidence  sufficient  to  withstand  a  directed  verdict
motion  at  trial  based  on  the  alleged  evidentiary  deficiency."  Id.
at  1117.   Where  the  nonmovant  attempts  to  carry  this  burden  instead
with  nothing  more  "than  a  repetition  of  his  conclusional
allegations,  summary  judgment  for  the  [movant  is]  not  only  proper
but  required."  Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir.
1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

### I. Plaintiff's Hearsay Declarations

During  the  Motions  Hearing  on  April  9,  2019,  Defendants  argued
that  much  of  Plaintiff's  declaration  attached  to  his  response  to
Defendants'  Motion  for  Summary  Judgment  contains  statements  that
would  not  be  admissible  at  trial  in  any  form  and  thus  cannot  be
considered  by  the  Court.   It  is  well-settled  that  "[e]vidence
inadmissible  at  trial  cannot  be  used  to  avoid  summary  judgment."
Lebron v. Sec'y of Fla. Dep't of Children & Families, 772 F.3d
1352, 1360 (11th Cir. 2014) (citation omitted); see also Fed. R.
Civ. P. 56(c)(4) ("An  affidavit  or  declaration  used  to  support  or
oppose  a  motion  must  be  made  on  personal  knowledge,  set  out  facts
that  would  be  admissible  in  evidence,  and  show  that  the  affiant  or
declarant  is  competent  to  testify  on  the  matters  stated.").

The  Court  finds  that  the  following  statements  contained  in
Plaintiff's  declaration  are  inadmissible  hearsay:  (1)  that  the  ER

14

doctor told Plaintiff that he immediately needed both an MRI and a consultation with an orthopedic surgeon, dkt. no. 39-1 ¶ 8; (2) that the ER doctor told Plaintiff and prison staff that a wheelchair was the best way for Plaintiff to get around, id. ¶ 11; (3) that Dr. Barber told Plaintiff on February 17, 2017, that Plaintiff needed an MRI as soon as possible and that surgery would probably be more complicated because of a delay in treatment, id. ¶ 19; (4) that after Dr. Barber received the MRI results he told Plaintiff that he recommended surgery within two weeks and that "the tibula fractures were not diagnosed earlier and therefore healed back improperly and the only way to correct the tibula fractures was to have a surgery in which the tibula is 're-broken' and reset so that they could heal properly," id. ¶ 23; (5) that Dr. Gaines told Plaintiff "that he could not perform the re-break surgery yet because [Plaintiff] could not bend [his] right knee enough," id. ¶ 25; and (6) that Dr. Gaines told Plaintiff that he needed physical therapy to increase his range of motion "enough to permit Dr. Gaines to perform the re-break surgery," id.

Plaintiff does not dispute that these statements constitute hearsay; rather, Plaintiff argues that these statements are admissible as excepted from the hearsay rule because they either fall within the ambit of Federal Rule of Evidence 803(4) as a "Statement Made for Medical Diagnosis or Treatment" or within the ambit of Federal Rule of Evidence 807, the "Residual Exception."

AO 72A
(Rev. 8/82)

Regarding Rule 803(4), the Court finds that this exception is not applicable to the hearsay statements at issue. That exception permits a statement that "(A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause." Fed. R. Evid. 803(4). As the Supreme Court has stated, "a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility." White v. Illinois, 502 U.S. 346, 356, (1992). This same guarantee of credibility is not present when a patient purports to recollect statements from his or her doctor in support of his or her lawsuit. Thus, the Court finds that Rule 803(4) does not apply to the statements made by the ER doctor or by Dr. Barber to Plaintiff. See Field v. Trigg Cty. Hosp., Inc., 386 F.3d 729, 736 (6th Cir. 2004) ("We agree that the hearsay exception set forth in Fed. R. Evid. 803(4) applies only to statements made by the one actually seeking or receiving medical treatment. Accordingly, the Vanderbilt physicians' statements—as statements made by consulting physicians to the treating physician—are not admissible pursuant to the Fed. R. Evid. 803(4) hearsay exception."); Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 564 (7th Cir. 1996) ("Rule 803(4) does not purport to except, nor can it reasonably be interpreted as excepting,

AO 72A
(Rev. 8/82)

statements by the person providing the medical attention to the patient."); <u>Stull v. Fuqua Indus., Inc.</u>, 906 F.2d 1271, 1274 (8th Cir. 1990) (finding that "to fall within the exception, the statement must be obtained from the person seeking treatment, or in some instances from someone with a special relationship to the person seeking treatment, such as a parent"); <u>Bulthuis v. Rexall Corp.</u>, 789 F.2d 1315, 1316 (9th Cir. 1985) ("Rule 803(4) applies only to statements made by the patient to the doctor, not the reverse.").

Similarly, the Court finds that the residual exception does not apply here because the guarantee of trustworthiness from Plaintiff's recollection of the ER doctor, Dr. Gaines, and Dr. Barber's statements does not have "equivalent circumstantial guarantees of trustworthiness," Fed. R. Evid. 807, as those statements covered by a hearsay exception in Rule 803 or 804. This is so for the same reason that a patient does not have a strong incentive for truthfulness when recollecting statements from his or her doctor in support of a lawsuit. Thus, the necessary circumstantial guarantees of trustworthiness are not present. <u>See Bulthuis v. Rexall Corp.</u>, 789 F.2d at 1316 (finding that statements from the plaintiff's mother that her doctor told her she was being given a certain drug did not fit within Rule 807 because that rule "requires guarantees of trustworthiness not present here—the

statement of plaintiff's mother was plainly self-serving and no corroboration was available").

For these reasons, all of the statements by the ER doctor and Dr. Barber set forth above are deemed inadmissible and will not be considered by the Court at this stage.

## II. The Claims at Issue

In his response to Defendants' Motion for Summary Judgment, Plaintiff argues that summary judgment on the following claims should be denied: (1) § 1983 claim for deliberate indifference to Plaintiff's serious medical needs by refusing to provide Plaintiff with a wheelchair, dkt. no. 1 at 23 ¶ 3; (2) § 1983 claim for deliberate indifference to Plaintiff's serious medical needs by refusing to have an MRI performed immediately after Plaintiff's visit to the emergency room, id. at 23 ¶ 5; and (3) § 1983 claim for deliberate indifference to Plaintiff's serious medical needs by failing to provide physical therapy allegedly ordered by Dr. Gaines to permit Plaintiff to have "re-break" surgery, id. at 24 ¶ 8. To the extent that Plaintiff has argued either new claims or failed to argue claims that were pleaded in the Complaint, those claims are due to be dismissed as either improperly pleaded, see Miccosukee Tribe of Indians of Fla. v. United States, 716 F.3d 535, 559 (11th Cir. 2013) (citation omitted) ("In this circuit, a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary

judgment."), or abandoned, see Boone v. City of McDonough, 571 F.
App'x 746, 751 (11th Cir. 2014) (finding claim abandoned when it
was in the complaint but not argued at the summary judgment stage).
Thus, only the three claims enumerated above are properly before
the Court.

## III. The Three Deliberate Indifference Claims

Plaintiff's three claims all allege violations of the Eighth
Amendment as applied to the states through the Due Process Clause
of the Fourteenth Amendment. "In order to prove deliberate
indifference a prisoner must shoulder three burdens. First, she
must satisfy the objective component by showing that she had a
serious medical need. Second, she must satisfy the subjective
component by showing that the prison official acted with deliberate
indifference to her serious medical need. Third, as with any tort
claim, she must show that the injury was caused by the defendant's
wrongful conduct." Goebert v. Lee Cty., 510 F.3d 1312, 1326 (11th
Cir. 2007) (citations omitted).

"A 'serious medical need' is one that is diagnosed by a
physician as requiring treatment or one that is so obvious that a
lay person would recognize the need for medical treatment."
Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1317 (11th Cir. 2010)
(internal quotation marks and citation omitted). "[T]he medical
need must be one that, if left unattended, poses a substantial
risk of serious harm." Taylor v. Hughes, No. 17-14772, 2019 WL

AO 72A
(Rev. 8/82)

1461316, at *3 (11th Cir. Apr. 3, 2019) (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)). In determining whether a serious medical need existed, courts "also consider whether a delay in treatment exacerbated the medical need or caused additional complications." Id. (citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188-89 (11th Cir. 1994)).

Regarding the subjective component, "the Supreme Court established that 'deliberate indifference' entails more than mere negligence." Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). As the Eleventh Circuit has explained, "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). Moreover, at this stage in the proceedings, "summary judgment must be granted for the defendant official unless the plaintiff presents evidence of the official's subjective knowledge, as follows: 'since a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk, a genuine issue of material fact exists only if the record contains evidence, albeit circumstantial, of such subjective awareness.'" Id. (quoting Campbell v. Sikes, 169 F.3d 1353, 1364 (11th Cir. 1999)).

AO 72A
(Rev. 8/82)

## A. The Wheelchair Claim

Under the summary judgment standard, Defendants, as the moving parties, bear the initial burden of demonstrating the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323, which can be done by showing an absence of evidence to support the nonmoving party's case, id. at 325. Here, Defendants have discharged this burden on the first and second elements of this claim, i.e., that Plaintiff did not have a serious medical need for a wheelchair and that they were not deliberately indifferent.

Defendants have provided extensive evidence showing that Plaintiff did not have a serious medical need for a wheelchair and that they were not deliberately indifferent. Specifically, Defendants have provided medical records showing that no doctor, including the ER doctors, Dr. Barber, Dr. Gaines, and Dr. Augustin, ordered or even recommended that Plaintiff use a wheelchair. Defendants have provided evidence that no medical record even mentions wheelchair, with the lone exceptions being that immediately after his injury Plaintiff was transported in a wheelchair to medical and that Plaintiff was discharged from the ER in a wheelchair. This evidence falls far short of showing that a physician required a wheelchair as part of Plaintiff's treatment such that Plaintiff had a serious medical need. Not only do the medical records show that no doctor indicated or ordered a wheelchair, Dr. Augustin swears that he "was not aware of any fact

21

which caused [him] to believe that a wheelchair was indicated or should be ordered by [him] at any time." Dkt. No. 34-4 ¶ 7. Dr. Augustin's position is corroborated by Dr. Barber, an independent (i.e., a non-party), orthopedic specialist, who evaluated Plaintiff and concluded that Plaintiff's diagnosis and condition on April 17, 2017, did not necessitate use of a wheelchair, and that a knee mobilizer and crutches were sufficient until Plaintiff could bear weight on his right knee. Dr. Barber further swears that after reviewing his colleague's, Dr. Hernandez, impressions, opinions, and plans from Plaintiff's February 17, 2017 appointment, "[t]here was nothing about [Plaintiff's] diagnosis and condition between the date of injury and February 17, 2017, that necessitated use of a wheelchair. A knee immobilizer and crutches were appropriate." Dkt. No. 34-6 ¶ 6. Finally, Defendants' medical expert Dr. Puerini found after reviewing Plaintiff's medical records that "no outside provider recommended or ordered a wheelchair for Mr. Truschke and a wheelchair was not indicated." Dkt. No. 34-1 at 6. All of this evidence, then, is sufficient to satisfy Defendants' burden of showing an absence of a genuine issue of material fact as to whether Defendants were deliberately indifferent to Plaintiff's serious medical need for a wheelchair.

Because Defendants have satisfied their burden, the burden shifts to Plaintiff to show that a genuine issue of material fact

exists on the issue of whether Plaintiff had a serious medical need for a wheelchair. Plaintiff cannot satisfy this burden. In support of Plaintiff's claim, Plaintiff declares that the ER doctor "told [him] and the prison staff that a wheelchair would be the best way to get around." Dkt. No. 39-1 ¶ 11. He further declares that he was never given a wheelchair, only crutches, and that on February 7, 2017,[1] even though he requested a wheelchair, his request was denied forcing him to use crutches to get from one end of the prison complex to the other end, causing severe pain. The pain was so bad, that on February 9, 2017, Plaintiff declares, he refused to make the same trek after his request for a wheelchair was again denied. These declarations are the extent of Plaintiff's evidence on this claim.

As a matter of law, Plaintiff has failed to show evidence of a serious medical need and deliberate indifference. As an initial matter, Plaintiff's declaration that his ER doctor "told [him] and the prison staff that a wheelchair would be the best way to get around," dkt. no. 39-1 ¶ 11, is inadmissible hearsay. As such, it cannot be used as evidence in opposition to the present motion for summary judgment.

Plaintiff, then, is left with his declarations that on February 9, 2017, he was "told that [he] needed to report to Old

---

[1] The Declaration says February 7, 2018. The Court construes the 2018 date as a typographical error.

AO 72A
(Rev. 8/82)

Medical Department," dkt. No. 39-1 at 14, that he "requested a wheelchair but was again denied," and that he later had such pain that he could not report to the medical department. Because Plaintiff has not provided admissible evidence from which a reasonable jury could find that he had been "diagnosed by a physician as mandating" use of a wheelchair, Farrow, 320 F.3d at 1243 (citation omitted), Plaintiff must show that his need for a wheelchair was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (citation omitted). Plaintiff has not done this because it is not so obvious that a broken leg necessitates use of a wheelchair; indeed, crutches are sufficient as Dr. Augustin and Dr. Barber opined and as the ER records indicated. See also Dkt. No. 34-2 at 46 ("Progress Note" by Nurse Bell on March 6, 2017, stating that Plaintiff was "stable and alert and ambulating on crutches without difficulties"). Plaintiff has provided no evidence to the contrary.

Turning to the deliberate indifference element, Plaintiff must make three showings: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). Plaintiff cannot show subjective knowledge of a risk of serious harm. Further, he cannot show that any

AO 72A
(Rev. 8/82)

Defendants were more than negligent (even if he could show that they were aware of a risk of serious harm).

Plaintiff's evidence that he requested a wheelchair from whomever told him to report to the Old Medical Department on February 9, 2017, does not raise a reasonable inference that any Defendant was aware of a risk of serious harm. First, it is unclear to whom Plaintiff spoke. Thus, the Court cannot infer that any of Defendants were even aware of Plaintiff's request. Second, even if every Defendant was aware that Plaintiff requested a wheelchair, Plaintiff cannot show that they had subjective knowledge of a risk of serious harm because Defendants were not subjectively aware that Plaintiff's failure to have a wheelchair risked serious harm. Instead, Defendants subjectively believed that crutches were sufficient to alleviate any risk of serious harm.[2]

Turning to whether the Defendants' conduct was more than negligent, Plaintiff has provided no evidence that it was. Instead, the record reveals that Defendants opined that in their medical judgment that crutches were sufficient. Even if Defendants' opinions were medically incorrect, Plaintiff does not provide any evidence that these opinions were reached out of malice

---

[2] For this same reason, the fact that Plaintiff failed to report to medical on a later date is not sufficient to show that Defendants were subjectively aware of a risk of serious harm.

AO 72A
(Rev. 8/82)

or recklessness as opposed to negligence. Thus, Plaintiff cannot show that Defendants' decision to not provide Plaintiff with a wheelchair was more than negligent. Accordingly, Plaintiff's claim with respect to the wheelchair fails as a matter of law.

For these reasons, Defendants' Motion on this claim is due to be **GRANTED**.

### B. The MRI Claim

Plaintiff claims that he had a serious medical need to have an MRI performed immediately after his ER visit on February 6, 2017. Plaintiff swears that on February 6, 2017, the ER doctor told him that he needed both a consultation with an orthopedic surgeon and an MRI immediately. On February 17, 2017, Plaintiff swears that Dr. Barber told him that he needed an MRI performed as soon as possible. On March 6, 2017, Plaintiff received an MRI. After the MRI, on an unspecified date, Plaintiff swears that "Dr. Barber recommended surgery within two weeks to repair the fractures of the tibula in order for it to heal properly." Dkt. No. 39-1 ¶ 23. Importantly, Plaintiff also swears that Dr. Barber "also informed [him] that due to the delay of the MRI, the tibula fractures were not diagnosed earlier and therefore healed back improperly and the only way to correct the tibula fractures was to have a surgery in which the tibula is 're-broken' and reset so that they can heal properly." Id. The Court, however, cannot

AO 72A
(Rev. 8/82)

consider any of these declarations because they are all inadmissible hearsay.

Defendants have satisfied their burden of showing that no genuine issue of material fact exists as to whether they were deliberately indifferent to a serious medical need for an MRI. First, Plaintiff's medical records from his February 6, 2017 ER visit do not mention an MRI, let alone recommend that one be performed immediately. Multiple x-rays were performed at the ER, and an orthopedist at the ER recommended a knee immobilizer and follow-up appointment, but absent from the recommendation was that an MRI be performed. Second, Dr. Puerini opines that if the ER medical staff believed an MRI was necessary, then no "policy, procedure, rule, mandate, or protocol" prohibited them from performing an MRI while Plaintiff was admitted to the ER on the date of his injury. Dkt. No. 34-1 at 6-7. Further, Dr. Puerini opines that based on Plaintiff's medical records, no MRI was performed while Plaintiff was in the ER, nor was an MRI ordered or suggested. Third, an MRI was recommended eleven days later on February 17, 2017, by PA Hernandez, but Dr. Barber swears that PA Hernandez's order was not a "STAT" order, meaning that the order for an MRI was not marked urgent by PA Hernandez. Dkt. No. 34-6 ¶ 6. Corroborating Dr. Barber's sworn statement is the document overviewing Plaintiff's discussions with PA Hernandez. The document, under the heading "PLAN," does note that an MRI is

recommended but does not state that the MRI was STAT or urgent. Dr. Barber further swears that he did not see or speak to Plaintiff on February 17, 2017. Again, corroborating this sworn statement, the February 17, 2017 document overviewing the appointment bears the signature of PA Hernandez and has a notation that Dr. Barber "e-signed" the document ten days later on February 27th. Dkt. No. 34-2 at 490. Finally, Dr. Augustin swears that an MRI was not recommended or ordered by the ER medical providers and that he "was not aware of any fact which caused [him] to believe that a MRI was indicated or should be ordered by [him] at any time prior to PA Hernandez's February 17, 2017 order for MRI." Dkt. No. 34-4 ¶ 8.

Because Defendants have satisfied their burden, the burden shifts to Plaintiff to show that a genuine issue of material fact exists on the issue of whether Defendants were deliberately indifferent to Plaintiff's serious medical need for an MRI immediately following his injury. The extent of Plaintiff's evidence is Plaintiff's declaration that the ER doctor told him that he needed an MRI immediately and that Dr. Barber told him on February 17, 2017, that he needed an MRI performed as soon as possible. Because these declarations contain inadmissible hearsay, Plaintiff is left with no record evidence that he had a serious medical need for an MRI to be performed immediately after his discharge from the ER, which occurred on February 6, 2017.

Notably, Plaintiff has provided no record evidence (other than inadmissible hearsay) that his leg healed improperly or that he needed a "re-break" surgery that would have been avoided with an immediate MRI. Thus, even if Plaintiff could show that he had a serious medical need for an MRI, which Plaintiff cannot, Plaintiff cannot show that the delay in receiving the MRI caused any harm.

For these reasons, Defendants' Motion on this claim is due to be **GRANTED**.

### C. The Physical Therapy Claim

Plaintiff's final claim alleges that Defendants were deliberately indifferent to Plaintiff's serious medical need for physical therapy treatment after Dr. Gaines ordered physical therapy on April 26, 2017. Defendants have carried their burden of demonstrating an absence of a genuine issue of material fact as to the subjective element of Plaintiff's claim, i.e., whether Defendants acted with deliberate indifference to Plaintiff's serious medical need. The subjective element of "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott, 182 F.3d at 1255. Put differently, Plaintiff must show "that the response made by public officials to that need was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in diagnosis or treatment, or

AO 72A
(Rev. 8/82)

even medical malpractice actionable under state law." <u>Faison v.
Rosado</u>, 129 F. App'x 490, 492 (11th Cir. 2005) (citation omitted).
Defendants have demonstrated that they were not deliberately
indifferent as a matter of law because they did not disregard the
risk of Plaintiff's serious medical need of physical therapy.

Before turning to Defendants' evidence, it is helpful to
review Plaintiff's evidence. Plaintiff declares that at his April
17, 2017 appointment with Dr. Barber, Dr. Barber (after reviewing
the March 6 MRI results) recommended surgery within two weeks so
that Plaintiff's fractures would heal properly; Plaintiff labels
this surgery as re-break surgery. Dr. Barber, Plaintiff declares,
referred Plaintiff to Dr. Gaines. On April 26, 2017, Plaintiff
had an appointment with Dr. Gaines, at which Plaintiff declares
that Dr. Gaines told him that he could not perform re-break surgery
until Plaintiff could bend his knee more. Thus, in order to have
the necessary surgery, Plaintiff declares that Dr. Gaines told him
that he needed physical therapy to increase the range of motion in
his knee. Finally, Plaintiff declares that he was never provided
physical therapy by Coffee Correctional, but instead, was merely
provided e-stimulation by means of a TENS unit, which only occurred
twice over the two months after his April 26 appointment. Thus,
Plaintiff claims that Defendants' were deliberately indifferent to
Plaintiff's serious medical need of physical therapy to improve
the functionality of his knee. As already determined, the

30

statements that Plaintiff declares were made by Dr. Gaines to Plaintiff are inadmissible hearsay.

First, addressing Nurse Chaney, she has shown as a matter of law that she was not deliberately indifferent to Plaintiff's serious medical need of physical therapy. First, Plaintiff has not shown any evidence that Nurse Chaney was aware of Plaintiff's need for physical therapy. Indeed, the record shows that it was Nurse Bell who performed Plaintiff's intake after Plaintiff's April 26 appointment with Dr. Gaines. Second, Nurse Chaney swears that she was not involved in any way in scheduling Plaintiff's physical therapy. Third, in Plaintiff's declaration, Plaintiff does not even mention Nurse Chaney in relation to this claim. Thus, Nurse Chaney has shown—and Plaintiff has not rebutted this evidence—that as a matter of law she was not subjectively aware of Plaintiff's serious medical need of physical therapy.

Turning to Nurse Bell, the analysis is similar. First, although Nurse Bell was aware of Plaintiff's need for physical therapy because she received Dr. Gaines's order calling for physical therapy, she notified Dr. Augustin, who ordered physical therapy for Plaintiff. Second, Nurse Bell swears that she was not involved in any way in scheduling Plaintiff's physical therapy. Third, she further swears that "no act or omission on my part negatively impacted the scheduling of Plaintiff's PT." Dkt. No. 34-5 ¶ 11. Finally, in Plaintiff's declaration, Plaintiff also

AO 72A
(Rev. 8/82)

does not mention Nurse Bell in relation to this claim. Thus, Nurse Bell has shown that she was not deliberately indifferent to Plaintiff's physical therapy need, but in fact was just the opposite—she notified Dr. Augustin of the need and was aware that Dr. Augustin addressed that need by ordering physical therapy. Beyond notifying the doctor, Nurse Bell has provided evidence that she could not do anything else regarding Plaintiff's physical therapy. Plaintiff has not carried his burden of rebutting this evidence. For these reasons, Nurse Bell has shown as a matter of law that she was not deliberately indifferent to Plaintiff's serious medical need of physical therapy.

Finally, no reasonable jury could find that Dr. Augustin was deliberately indifferent to Plaintiff's serious medical need of physical therapy because Plaintiff cannot show that Dr. Augustin was more than negligent. "Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986)). "Mere incidents of negligence or malpractice do not rise to the level of constitutional violations . . . [n]or does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment."

AO 72A
(Rev. 8/82)

*Id.* First, Dr. Augustin timely ordered physical therapy and noted during follow-ups that Plaintiff was receiving the physical therapy that he ordered. Second, Dr. Augustin formed the medical opinion that self-rehab for Plaintiff was sufficient such that even if Plaintiff was not receiving adequate physical therapy from a physical therapist, Plaintiff's serious medical need was sufficiently addressed by the detailed instructions Plaintiff received for performing physical therapy by himself. Thus, Dr. Augustin not only subjectively believed that Plaintiff was seeing a physical therapist, but Dr. Augustin also formed the medical opinion that self-rehab was most appropriate for Plaintiff. Accordingly, Dr. Augustin was, at best, negligent, and Plaintiff cannot show otherwise.

Looking at Plaintiff's evidence on this claim against Dr. Augustin, Plaintiff has identified no act or omission by Dr. Augustin regarding this claim, let alone evidence of any act or omission. The only evidence Plaintiff has set forth is his declaration that he did not receive adequate physical therapy, but that declaration neither mentions Dr. Augustin's name regarding this claim nor identifies how Dr. Augustin was deliberately indifferent. The Court has also found evidence in the record that Dr. Augustin noted on August 9, 2017, that Plaintiff complained that his physical therapy was inadequate. Thus, Dr. Augustin was aware that Plaintiff believed his physical therapy was inadequate.

33

Regarding the first reason that this claim fails, the record shows that Dr. Augustin ordered physical therapy for Plaintiff and that he took measures to ensure Plaintiff was receiving the therapy. The record shows that on the day Plaintiff returned with an order from Dr. Gaines for physical therapy, Dr. Augustin ordered physical therapy for Plaintiff. Indeed, both parties agree that "Dr. Augustin considered Dr. Gaines' recommendations and ordered PT, knee sleeve, cane and follow up." Dkt. No. 39-2 ¶ 48. In addition, Plaintiff's medical records show that he was seeing Dr. Cronin, a licensed physical therapist, at least once a week beginning at the end of May 2017. Thus, Dr. Augustin's order of physical therapy were being followed. The medical records also show that Plaintiff was "currently on PT" when Dr. Augustin saw him on June 1, 2017. Dkt. No. 34-2 at 40. Similarly, the medical records show that Plaintiff acknowledged on August 9, 2017, that he was receiving physical therapy, although he complained of it being inadequate. And again, another chart report from November 7, 2017, electronically signed by Dr. Augustin as the author, states that Plaintiff "has been on PT for several mos [sic]." Id. at 33. Finally, Dr. Puerini opines: Plaintiff "received timely and consistent physical therapy in accord with the standard of care . . . [but Plaintiff] inconsistently adhere[d] to the plan of care, frequently missing appointments for care." Dkt. No. 34-1 at 7. Thus, Dr. Augustin has shown that he ordered physical therapy

AO 72A
(Rev. 8/82)

treatment for Plaintiff, and that he documented three separate times over the next several months that Plaintiff was getting this treatment.

Plaintiff's testimony that he merely received therapy twice over a two-month span consisting of the attachment of a TENS unit does not create a factual issue because it does not rebut the evidence that Dr. Augustin ordered physical therapy and that he documented that Plaintiff was receiving physical therapy. Plaintiff's evidence shows at most that Dr. Augustin was negligent in not ensuring that Plaintiff's therapy was more robust. Plaintiff has set forth no evidence that Dr. Augustin's actions were so "grossly incompetent" as to "shock the conscience." Harris, 941 F.2d at 1505 (citation omitted).

Turning to the second reason, Dr. Augustin swears that based on his "education, training, experience and Plaintiff's medical records, Plaintiff had an ACL deficient knee. Conservative treatment in the form of self-rehab and PT was most appropriate for him." Dkt. No. 34-4 ¶ 19. On April 26, 2017, Dr. Gaines gave Plaintiff detailed instructions and nine exercises that Plaintiff was to perform daily or every other day. This exercise program was issued by the "PT Dept" of Dr. Gaines' office. Dkt. No. 34-2 at 326. The nine exercises given to Plaintiff by Dr. Gaines could be performed without a physical therapist, i.e., Plaintiff could perform them by himself. Further, Plaintiff was given range of

AO 72A
(Rev. 8/82)

motion exercises back on February 17, 2017, by PA Hernandez, who did not order physical therapy with a physical therapist. Dr. Barber did not order physical therapy with a physical therapist either, but Dr. Barber also gave Plaintiff exercises to "work on quad strengthening." Dkt. No. 34-2 at 491. Considering Dr. Augustin's medical opinion that physical therapy without seeing a physical therapist, i.e., self-rehab, was sufficient, that PA Hernandez and Dr. Barber, an orthopedist, did not order physical therapy but gave Plaintiff exercises for self-rehab, and that Dr. Gaines gave Plaintiff physical therapy exercises to perform on his own, no reasonable jury could find that Dr. Augustin was deliberately indifferent to Plaintiff's serious medical need of physical therapy because in Dr. Augustin's medical opinion Plaintiff had everything necessary for him to perform self-rehab. Plaintiff has provided no evidence to rebut this evidence (other than his declaration that he was provided no physical therapy, which does not speak to the issue of self-rehab). Thus, no reasonable jury could find that Dr. Augustin was deliberately indifferent to Plaintiff's serious medical need of physical therapy because that need was sufficiently addressed by detailed instructions for self-rehab by two licensed orthopedists and a physician's assistant. Again, Plaintiff has not shown that Dr. Augustin's opinion was so "grossly incompetent" as to "shock the conscience." 941 F.2d at 1505 (citation omitted).

36

For these reasons, Defendants' Motion on this claim is due to be **GRANTED**.

### CONCLUSION

For all of the reasons set forth above, Defendants Nurse Chaney, Nurse Bell, and Dr. Augustin's Motion for Summary Judgment, dkt. no. 34, is **GRANTED**.  The Clerk is **DIRECTED** to close this case.

**SO ORDERED**, this 2nd day of May, 2019.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)